# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1221
No. 00-1535

_____

| | | |
|---|---|---|
| IES Industries, Inc., and Subsidiaries, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Alliant Energy Corporation, Successor in Interest to IES Industries, Inc., and Subsidiaries, | * | Appeal from the United States District Court for the Northern District of Iowa. |
| | * | |
| Appellant/Cross-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: January 10, 2001
Filed: June 14, 2001

_____

Before RICHARD S. ARNOLD and BOWMAN, Circuit Judges, and KYLE,[1] District
 Judge.

_____

BOWMAN, Circuit Judge.

------

[1]The Honorable Richard H. Kyle, United States District Judge for the District
of Minnesota, sitting by designation.

IES Industries, Inc.,[2] appeals from the order of the District Court granting the United States summary judgment on IES's claim for tax refunds to which IES contends it is entitled as a result of securities trades that the court held to be sham transactions. The United States cross appeals, challenging the District Court's decision granting summary judgment to IES on its second claim for a tax refund, that IES is entitled to deduct fifteen years' worth of environmental cleanup cost assessments in the tax year in which the amount of the liability was determined. We affirm in part and reverse in part.

## I. IES's Appeal

We review de novo a district court's decision to grant summary judgment, and will affirm if the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Land v. Washington County, Minn., 243 F.3d 1093, 1095 (8th Cir. 2001). The material facts are undisputed; the question of law before us is "[t]he general characterization of a transaction for tax purposes." Frank Lyon Co. v. United States, 435 U.S. 561, 581 n.16 (1978). Before we discuss the legal question, we first set out in some detail the facts leading to IES's claim for a tax refund, drawing heavily on the parties' very helpful stipulation of facts.

The transactions at issue involved American Depository Receipts, or ADRs. ADRs are publicly traded securities, or receipts, fully negotiable in U.S. dollars, that represent shares of a foreign corporation held in trust by a U.S. bank. The owner of an ADR is entitled to all dividends and capital gains associated with the ADR, with those moneys taxable in the home country of the foreign corporation.

---

[2]Alliant Energy Corporation is the successor in interest to IES Industries, Inc. The parties and the District Court nevertheless refer to the taxpayer as IES; we will do the same here.

Before a dividend is paid on an ADR, the corporation issuing the stock will declare the amount to be paid, the record date, and the payment date. The owner of the ADR as of the close of business on the record date will be paid the dividend. The payment date for the dividend ordinarily is several weeks or more after the record date. When a dividend is paid, tax is withheld, usually by the foreign corporation, before the funds are transferred to the United States. In this case, the ADR dividends were paid by corporations in the United Kingdom, the Netherlands, and Norway. Under the terms of tax treaties between those countries and the United States, the withholding rate on ADR dividends paid to U.S. citizens is 15%. Thus the record owner of the ADR would receive 85% of the dividend in cash, but the gross income—100% of the dividend—would be fully taxable in the United States. In these circumstances, the record owner is entitled to a 15% foreign tax credit, a dollar-for-dollar credit against U.S. taxes owed.

In 1991, Twenty-First Securities Corporation, a securities broker in New York, proposed ADR trading opportunities to IES, an electric utility company in Iowa. After some initial investigation, IES decided to sign on. The trades worked as follows.

Twenty-First was responsible for identifying and locating ADRs whose companies had announced dividends. IES purchased ADRs with a settlement date, or effective trade date, before the record date for the dividend, so that IES was the owner on the record date and therefore entitled to be paid the dividend. IES then promptly sold the ADRs, with a settlement date after the record date. The purchase and sale generally took place within hours of each other, and sometimes in Amsterdam when the U.S. and European markets were closed.

The sellers of the ADRs were tax-exempt entities, such as pension funds. But such entities were exempt only from U.S. taxes; they still were required to pay the 15% foreign tax on any ADR dividends collected. Because they owed no U.S. tax, they could not benefit from the foreign tax credit. Before the dividend record date, the tax-

exempt holders of the ADRs loaned them to a counterparty selected by Twenty-First. The counterparty then sold the ADRs short (that is, sold borrowed property) to IES, which then became the actual owner of the ADRs with full right, title, and interest in the ADRs. The counterparty bought back the ADRs after the dividend accrued to IES.

The purchase price of the securities was equal to market price plus 85% of the ADRs' expected gross dividends, that is, the same amount the ADR lender would have received after foreign tax was withheld had it been the record owner entitled to payment of the dividends. In addition, the lender received a deposit of cash (or equivalent) collateral, generally 102% of the market value of the ADRs on loan. The lender would have that collateral available to invest during the term of the loan of the ADRs, thus earning a profit on its loan. IES paid commissions to Twenty-First on the purchases and sales; Twenty-First in turn paid the counterparty a fee, generally $1000 per trade day. IES sold the ADRs back to the lenders at market price.

So, IES purchased ADRs with dividend rights attached, or cum-dividend, for more than it sold them ex-dividend, thus incurring capital losses. IES sought to carry back the losses to offset capital gains received when it sold stock in tax years 1989 and 1990, and thus to receive a refund of capital gains taxes paid in those years. (Capital losses could not be used to offset "ordinary" income, but they could be carried back three years or carried forward five years to offset capital gains.)

While generating capital losses on each ADR purchase/sale combination, IES nevertheless made a profit because it was entitled to the dividends, which actually exceeded the capital losses. IES retained the dividends, which were ordinary income to the company, paid the 15% foreign tax, and therefore claimed a 15% foreign tax credit in the United States. IES claimed deductions for the commissions it paid Twenty-First. Further, IES purchased the ADRs on margin and incurred interest expense that it also claimed as a deduction. After 1992, IES did not engage in any

-4-

additional ADR trades.  By then, it had offset all of its 1989 and 1990 capital gains with the capital losses incurred as a result of the ADR trades.

Thus, for its 1991 and 1992 taxes, IES:

1. Reported gross dividend income on the ADR dividends of nearly $90.8 million.

2. Claimed a foreign tax credit on the ADR dividends for the amount of foreign tax withheld and paid to foreign governments, over $13.5 million.

3. Recognized capital losses from the ADR purchases and sales and sought to carry back more than $82.7 million to offset capital gains earned in 1989 and 1990.  An additional $56,643 in capital losses offset capital gains earned in 1992.

4. "[I]ncluded the commissions it paid to purchase ADRs in its basis, and deducted the commissions paid to sell ADRs from the amount realized."  Brief of Appellant IES at 17.

5. Deducted over $3.1 million in interest expense incurred in purchasing the ADRs on margin.

The Internal Revenue Service (IRS) audited IES's tax returns for 1991 and 1992 and disallowed the claimed capital losses and the concomitant 1989 and 1990 capital loss carrybacks.  The IRS further disallowed the ADR-related foreign tax credit and eliminated the reported dividend income.  Deductions for interest expenses, commissions, and one-half of the foreign income tax paid on the ADR transactions were allowed.[3]

---

[3]The IRS argued in the District Court that the agency was mistaken to allow IES to claim deductions for interest, commissions, and one-half of the foreign income tax withheld, and sought an offset against any overpayment of taxes by IES (that is, refunds due IES).  (The IRS was time-barred from assessing the taxes, I.R.C. § 6501(a), but it could seek to offset any refund due IES by the amount of the taxes, Lewis v. Reynolds, 284 U.S. 281, 283, modified, 284 U.S. 599 (1932).)  The District Court

IES sought a refund of over $26 million, plus interest. The government rejected the claim and IES filed suit in the District Court. The court granted the government's motion for summary judgment, concluding that the transactions "were shaped solely by tax avoidance considerations, had no other practical economic effect, and are properly disregarded for tax purposes." Order of Sept. 22, 1999, at 3. IES appeals and we reverse.

The District Court viewed "[t]he question presented" as "whether these transactions are a sham and therefore to be disregarded for tax purposes." Id. at 3. In determining whether a transaction is a sham for tax purposes, the Eighth Circuit has applied a two-part test set forth in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91-92 (4th Cir. 1985), which the Fourth Circuit ostensibly found in the Supreme Court's opinion in Frank Lyon Co. See Shriver v. Comm'r , 899 F.2d 724, 725-26 (8th Cir. 1990). Applying that test, a transaction will be characterized as a sham if "it is not motivated by any economic purpose outside of tax considerations" (the business purpose test), and if it "is without economic substance because no real potential for profit exists" (the economic substance test). Id. at 725, 725-26. The Shriver Court analyzed the transaction at issue in that case under both parts of the test, but then said in dictum, "[W]e do not read Frank Lyon to say anything that mandates a two-part analysis." Id. at 727. The Court suggested that a failure to demonstrate either economic substance *or* business purpose—both not required—would result in the conclusion that the transaction in question was a sham for tax purposes. As in Shriver, we do not decide whether the Rice's Toyota World test requires a two-part analysis because we conclude that the ADR trades here had both economic substance and business purpose.

---

agreed with the government's position that the IRS should not have allowed the deductions; IES also appeals that determination. Our holding here—that IES is entitled to the tax refund it seeks in connection with the ADR trades—resolves this issue as well.

The District Court dealt with the sham transaction issue summarily and did not apply, or even mention, the Rice's Toyota World test iterated in Shriver. After a cursory review of the facts and the law, the court simply concluded that the only change in IES's "economic position" as a result of the ADR transactions was "the transfer of the claim to the foreign tax credit to IES," and therefore that the transactions were shams.[4] Order of Sept. 22, 1999, at 3. Assuming this was an application of the objective economic substance test, we will first consider whether there was a "reasonable possibility of profit . . . apart from tax benefits," that is, whether the transactions had economic substance. Shriver, 899 F.2d at 726 (quoting Rice's Toyota World, 752 F.2d at 94).

The government insists that, "absent the tax benefits that were the sole reason for the transactions, each series of ADR trade pairs resulted, as pre-planned, in an economic loss." Brief of Appellee United States at 35. According to the government's view of the transaction, "IES purchased only the right to the net dividend -- not the gross dividend." Id. at 36. Under that view, economic benefit accrues to IES *only* if it receives the foreign tax credit. In other words, the government would have us regard only 85% of the dividends as income to IES, notwithstanding that the IRS treats 100% as income for tax purposes.

We reject the government's argument and agree with IES that the law supports our contrary conclusion: the economic benefit to IES was the amount of the *gross* dividend, before the foreign taxes were paid. IES was the legal owner of the ADRs on the record date. As such, it was legally entitled to retain the benefits of ownership, that is, the dividends due on the record date. While it received only 85% in cash, 100% of the amount of the dividends was income to IES. "'[I]ncome' may be realized by a

---

[4]In so holding, the District Court reached the same result as the United States Tax Court in Compaq Computer Corp. v. Commissioner, 113 T.C. 214 (1999), filed just one day before the order in this case.

variety of indirect means." Diedrich v. Comm'r, 457 U.S. 191, 195 (1982) (analyzing, and ultimately agreeing with, IRS's position that payment of gift tax by donee, which was obligation of donor, constituted income to donor). In this case, income was realized by the payment of IES's foreign tax obligation by a third party. The fact that the taxes were withheld, and then paid, by the foreign corporation that issued the stock represented by the ADRs, so that IES received only 85% of the dividend in cash, is of no consequence to IES's liability for the tax. "The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed." Id. (quoting Old Colony Trust Co. v. Comm'r, 279 U.S. 716, 729 (1929)). The foreign corporation's withholding and payment of the tax on IES's behalf is no different from an employer withholding and paying to the government income taxes for an employee: the full amount before taxes are paid is considered income to the employee. See id. Because the entire amount of the ADR dividends was income to IES, the ADR transactions resulted in a profit, an economic benefit to IES.

As for the business purpose test, the Shriver court explained that the proper inquiry is "whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved." Shriver, 899 F.2d at 726. In other words, the business purpose test is a subjective economic substance test. The Shriver Court considered the district court's "subjective analysis of the taxpayer's intent" and the court's review of such factors as the depth and accuracy of the taxpayer's investigation into the investment. Id. To the extent the taxpayer's subjective intent is material, we too will consider factors that are arguably relevant to the inquiry. We do so, however, mindful of the fact that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469 (1935). A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction.

In their briefs, both parties discuss the risk of loss inherent in the trades, evidently presuming that the degree of risk goes to IES's subjective intent in engaging in the transactions. The government argues that the transactions must be characterized as shams because there was no risk of loss. We disagree. The risk may have been minimal, but that was in part because IES did its homework before engaging in the transactions. Company officials met twice with Twenty-First representatives and studied the materials provided. After that, IES consulted its outside accountants and its securities counsel for reassurances about the legality of the transactions and their tax consequences. Cf. Compaq Computer Corp. v. Comm'r, 113 T.C. 214, 224-25 (concluding no business purpose existed where taxpayer's "evaluation of the proposed transaction was less than businesslike with [taxpayer's assistant treasurer] committing [taxpayer] to this multimillion-dollar transaction based on one meeting with Twenty-First and on his call to a Twenty-First reference"). As the entity legally entitled to receive the ADR dividends, being the legal owner on the record date, IES likewise bore the risk that the dividend would not be paid. In consideration of that risk and after doing its own investigation, IES rejected some of the ADR trades that Twenty-First proposed. Cf. id. at 223 (noting that taxpayer did no investigation or analysis of risks of ADR trades). IES did make some of the trades when the U.S. markets were closed, in order to avoid the risk of fluctuations in market price of the ADRs between the purchase and sale and to prevent a third party from attempting to break up the trades, again demonstrating the exercise of good business judgment. We are not prepared to say that a transaction should be tagged a sham for tax purposes merely because it does not involve excessive risk. IES's disinclination to accept any more risk than necessary in these circumstances strikes us as an exercise of good business judgment consistent with a subjective intent to treat the ADR trades as money-making transactions.

It also is important to note that these were not transactions conducted by alter-egos of IES or straw entities created by IES simply for the purpose of conducting ADR trades. See Frank Lyon Co., 435 U.S. at 580. All of the parties involved—the foreign corporations, the trusts issuing the ADRs, the tax-exempt ADR owners, Twenty-First,

other brokers involved, the counterparties—were entities separate and apart from IES, doing legitimate business before IES started trading ADRs and (as far as we know) continuing such legitimate business after that time. See United States v. Consumer Life Ins. Co., 430 U.S. 725, 737 (1977); Goldstein v. Comm'r, 364 F.2d 734, 737-38 (2d Cir. 1966), cert. denied, 385 U.S. 1005 (1967). "[T]he transaction[s] must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945). Each trade was an arm's-length transaction: "what was actually done is what the parties to the transaction purported to do." Gran v. IRS (In re Gran), 964 F.2d 822, 825 (8th Cir. 1992) (citations to quoted cases omitted). The fact that IES took advantage of duly enacted tax laws in conducting the ADR trades does not convert the transactions into shams for tax purposes.[5]

We hold, considering all the facts and circumstances of this case, that the ADR trades in which IES engaged did not, as a matter of law, lack business purpose or economic substance. Accordingly, IES is entitled to summary judgment on its claim for a tax refund. The judgment is reversed and the case is remanded to the District Court for further action consistent with this opinion.

## II. The Government's Cross Appeal

---

[5]In 1997, Congress amended the tax code to increase to at least sixteen days the amount of time an ADR must be held within a thirty-day period that includes the dividend record date in order for the foreign taxes paid on the dividend to qualify for the foreign tax credit. I.R.C. § 901(k) (Supp. III 1997). Each side would have us read more into the amendment than the legislative history and proper statutory interpretation permit. On its face, the amendment merely requires a holding period longer than the holding period previously required, thus making ADR transactions like the ones involved in this case much less attractive to taxpayers.

At all times relevant to the government's cross appeal, IES was a 70% owner of a nuclear power plant in Iowa. During this period, the government was the exclusive provider of uranium-enrichment services required to fuel such plants. The services were purchased either directly from the United States Department of Energy (DOE)[6] or on a secondary market where utilities that had purchased the services from the DOE resold them to others. Between 1972 and 1992, IES purchased most of the required services from the DOE but did buy some from secondary sources.

In 1992, Congress enacted the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (EPACT). Among other things, EPACT establishes a fund for the decontamination and decommissioning of uranium-enrichment plants. The $480 million in annual deposits to the fund are to come largely from congressional appropriations, but up to $150 million annually (adjusted for inflation) is to be collected for fifteen years (1993 through 2008, or until $2.25 billion, adjusted for inflation, is deposited) from domestic utilities. The amount each utility is assessed is calculated based upon that utility's *previous* use of uranium-enrichment services, regardless of whether those services were purchased directly from the DOE or on the secondary market. See 42 U.S.C. §§ 2297g to 2297g-4 (Supp. IV 1992).

Thus, in 1992, IES became liable for fifteen special assessments totaling $16,020,125 (exclusive of the annual adjustment for inflation), and made the first payment in 1993. IES filed an amended corporate federal income tax return for 1992 seeking a tax refund based on its position that the liability for the entire $16 million assessment was incurred in 1992, even though none of it had been paid. The IRS

---

[6]Before the DOE, services were purchased from the Atomic Energy Commission, another government entity. Because the specific identity of the provider of enrichment services in this case is of no consequence, we will refer to both as the DOE.

denied the refund. IES brought suit in the District Court, which granted summary judgment to IES on this part of IES's tax refund claim.[7]

As an accrual method taxpayer, income to IES is taxable in the year the income is accrued, or earned, even if it is not received in that year. Treas. Reg. § 1.451-1(a). Likewise, a liability

> is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which [1] all the events have occurred that establish the fact of the liability, [2] the amount of the liability can be determined with reasonable accuracy, and [3] economic performance has occurred with respect to the liability.

Id. § 1.461-1(a)(2)(i). Conditions [1] and [2] together compose what is known as the "all events" test. I.R.C. § 461(h)(4). There is no dispute that the "all events" test was satisfied in 1992 with the passage of EPACT. The only issue is whether economic performance has occurred. IES's position is that it has, and therefore IES is entitled to a full deduction of the assessments in tax year 1992. We agree.

The general rule is that economic performance occurs as services are provided to the taxpayer if "the liability of the taxpayer *arises out of* . . . the providing of services to the taxpayer by another person." Id. § 461(h)(2)(A)(i) (emphasis added); accord Treas. Reg. § 1.461-4(d)(2)(i). If, as IES contends, the liability arose out of the DOE's provision of uranium-enrichment services, then all conditions have been met for full deductibility in tax year 1992. But if not, then, as the government argues, Treas. Reg. § 1.461-4(g)(7) applies:

---

[7]It was this refund that the IRS sought to offset when it challenged certain deductions it had previously allowed for expenses associated with the ADR trades. See supra n.3.

> In the case of a taxpayer's liability for which economic performance rules are not provided elsewhere in this section or in any other Internal Revenue regulation, revenue ruling or revenue procedure, economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed.

In that case, the assessments would be deductible only as paid.

We think the government's position is untenable on these facts and conclude that the EPACT assessments are properly characterized as arising out of the provision of services, all of which services had been provided by the time the EPACT payments were assessed. Accordingly, § 1.461-4(g)(7) is inapplicable.

The relevant facts support our conclusion. The amount of the assessments was calculated based on the uranium-enrichment services actually used by IES—including those that were purchased on the secondary market. This establishes a direct link between the amount assessed and the services provided. It is the *prior* generation of uranium-enrichment services at the DOE's plants that resulted in the need for decommissioning and decontamination. Users pay proportionately: the more they used the services before the passage of EPACT, the more they pay to clean up the contamination that resulted from the provision of those past services. If cleanup costs had been considered up-front, they likely would have been included in the cost of the services provided, to the same effect as the after-the-fact assessment. Only those utilities that were actually provided services before 1992 pay now for cleanup.[8]

---

[8]The government contends that its position, "that IES's liability for special assessments did not arise out of DOE's provision of enrichment services to it . . ., is confirmed by the fact that the amount of the special assessments made against IES took into account the enrichment services that IES purchased on the secondary market as well as the enrichment services that IES contracted for with DOE." Reply Brief of Cross Appellant United States at 4. The government does not explain why that should be so, and we find the contention counterintuitive. The facilities required

-13-

The government asserts that EPACT's legislative history demonstrates that the contamination resulting from the production of enriched uranium went unrealized until *after* the services had been provided, and so the special assessments are intended to cover *future* costs of cleaning up. According to this theory, the liability thus arose out of the passage of EPACT, not the provision of previous services. We find this argument specious. Assuming, arguendo, that the government's interpretation of the legislative history is accurate (much less relevant), that reading does not support the government's position in this appeal. The assessments are based on the services provided even though the cleanup did not begin until the money for it was appropriated and collected. It cannot be denied that it was the operation of the facilities, which operation occurred only to provide enriched-uranium services, that made the decommissioning and decontamination of those facilities necessary, then, now, or into the future. Again, the correlation between the assessments and the services provided to each assessed utility could not be more direct.

The government maintains that the opinion in Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998), should control the result here. We disagree. Yankee Atomic is a constitutional law case, so the "arising out of" part of the economic-performance test for the timing of deductible liabilities is never discussed, and the issues that are discussed are not analogous. The government's heavy reliance on the Yankee Atomic decision suggests the government fundamentally misunderstands the opinion.

In Yankee Atomic, a utility challenged the EPACT assessments as an unconstitutional exercise of Congress's taxing power. The Federal Circuit concluded

decommissioning and decontamination as a direct result of their production of enriched-uranium services. Under EPACT those utilities that ultimately used the services were liable for the assessments, not those that purchased services but never used them. The nexus between the EPACT liability of the beneficial users of the services and the *previous* provision of those services to such users is clearly established.

-14-

otherwise, holding that EPACT "is a sovereign act because it is designed to spread the costs associated with the decontamination and decommissioning over all domestic utilities that used the DOE's uranium enrichment services." 112 F.3d at 1581. According to the government, Yankee Atomic is "directly relevant" because the court held "that the proximate cause of a utility's liability for the special assessments was the enactment of EPACT." Brief of United States as Cross Appellant at 59.

The government is simply wrong. The Yankee Atomic court repeatedly connected the EPACT assessment to the past use of services provided. See, e.g., 112 F.3d at 1571 (describing EPACT liability as "a special assessment to aid in funding the clean-up costs associated with the facilities that provided those enrichment services"); 1572 (noting that Congress recognized "there would be large costs associated with decontaminating and decommissioning the facilities that had previously been used to provide enrichment services"), ("Because this decontamination and decommissioning fiscal problem was not recognized until the 1980s, the prices charged in the Government's past uranium enrichment contracts had not accounted for the problem."); 1575 ("[T]he Act targets whichever utility eventually used and benefited from the DOE's enrichment services."). In fact, in Yankee Atomic, even though the utility challenging the assessments had closed its nuclear facilities before EPACT was enacted, the court held the utility was liable for the assessments because it had used the services, id. at 1581, that is, the liability arose out of the provision of the services. If anything, the Yankee Atomic opinion supports IES's position, not the government's.

The government also relies on Yankee Atomic for its alternative (and poorly developed) argument that "the liability also properly could be characterized as 'taxes' under subparagraph (g)(6)." Brief of United States as Cross Appellant at 60. If that were the case, the assessment would be deductible only when paid. See Treas. Reg. § 1.461-4(g)(6) ("[I]f the liability of a taxpayer is to pay a tax, economic performance occurs as the tax is paid to the governmental authority that imposed the tax."). In support of this tax theory, the government merely cites Yankee Atomic, wherein the

court said, "[T]he assessment appears to be very similar to . . . a general tax that falls proportionally on all utilities that benefited from the DOE's uranium enrichment services." Yankee Atomic, 112 F.3d at 1576. In a footnote, the government suggests that, because the assessments were imposed to support the government, they are taxes. The government's "fair reading" of the Yankee Atomic opinion—"that the special assessments are 'taxes' governed by Section 1.461-4(g)(6)," Reply Brief of Cross Appellant United States at 6—is not fair at all. We decline to take an equivocal sentence ("*appears* to be . . . *similar* to") out of context from a case in which the sole issue was the constitutionality of EPACT and treat it as controlling of the question before us: how EPACT liabilities should be treated for tax deductibility purposes.

The summary judgment for IES on this issue is affirmed.

III.

The judgment of the District Court on IES's claim for a tax refund as a consequence of the ADR trades is reversed and the case is remanded for further proceedings. The judgment of the District Court on the deductibility of IES's EPACT assessments is affirmed. IES's motion to file a supplemental appendix is granted.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.