# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3616
_____

WFC Holdings Corporation

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 16, 2013
Filed: August 22, 2013

_____

Before WOLLMAN, MURPHY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

WFC Holdings Corporation (WFC) appeals from the judgment of the district court,[1] which held that WFC is not entitled to a tax refund for a capital loss it claimed as a result of a complex transaction involving the transfer of leases and the sale of

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

stock. We hold that WFC failed to adequately show that the transaction had either objective economic substance or a subjective, non-tax business purpose, and we affirm.

## I. *Background*

In 1996, Wells Fargo & Company ("Old Wells Fargo" or OWF) acquired First Interstate Bancorp ("First Interstate") in a hostile takeover. OWF and First Interstate had overlapping geographical footprints, and the acquisition left OWF with unexpected real estate liabilities consisting of a large number of leased properties that were no longer needed for its business operations. OWF remained obligated to pay rent on the properties. Some of the properties were "underwater," meaning that OWF's rent obligations exceeded the amount of rent it could obtain from subleasing the property. In 1998, OWF merged with Norwest Corporation to become WFC. WFC retained the real estate liabilities that OWF had acquired through the latter's takeover of First Interstate.

Customarily, WFC files consolidated income tax returns for its various banking and non-banking subsidiaries. Among WFC's banking subsidiaries are Wells Fargo Bank, N.A. and Wells Fargo Bank (Texas), N.A. (collectively, "the Bank"). WFC's leases were held by the Bank, which is subject to the regulatory oversight of the Office of the Comptroller of the Currency (OCC). The OCC regulates federally chartered banks' real estate holdings pursuant to the National Bank Act (NBA). *See* 12 U.S.C. § 29. The NBA permits a national bank to hold real estate only for use in its banking business and other limited purposes. *See id.* Real estate held for other purposes, including "[f]ormer banking premises," are referred to as "[o]ther real estate owned (OREO)" (or ORE).12 C.F.R. § 34.81(e)(2). "[F]ormer banking premises" that the bank currently leases qualify "as OREO when a bank no longer uses the property for its banking business." OCC Interpretive Letter, 1983 WL 145898, at \*1–3.

The NBA requires national banks to dispose of OREO within five years. 12 U.S.C. § 29; *see also* 12 C.F.R. § 34.82(a) ("A national bank shall dispose of OREO at the earliest time that prudent judgment dictates, but not later than the end of the holding period (or an extension thereof) permitted by 12 U.S.C. 29."). "A national bank may comply with its obligation to dispose of [leased] real estate under 12 U.S.C. 29 . . . [b]y obtaining an assignment or a coterminous sublease," i.e., a sublease coterminous with the bank's master lease. 12 C.F.R. 34.83(a)(3)(i). The OCC may extend the five-year disposition period for up to "an additional five years, if (1) the [bank] has made a good faith attempt to dispose of the real estate within the five-year period, or (2) disposal within the five-year period would be detrimental to the [bank]." 12 U.S.C. § 29. Furthermore, in 1996 the OCC amended the regulations to toll the disposition period for the duration of any non-coterminous sublease. 12 C.F.R. § 34.83(a)(3)(i). The 1996 amendment also permitted

> [a] national bank holding a lease as OREO [to] enter into an extension of the lease that would exceed the holding period referred to in § 34.82 if the extension meets the following criteria:
>
> > (A) The extension is necessary in order to sublease the master lease;
> >
> > (B) The national bank, prior to entering into the extension, has a firm commitment from a prospective subtenant to sublease the property; and
> >
> > (C) The term of the extension is reasonable and does not materially exceed the term of the sublease . . . .

*Id.*

In 1998, prior to OWF's merger with Norwest to become WFC, KPMG, LLC ("KPMG") served as OWF's accounting firm. At that time, KPMG marketed a

contingent-liability tax-reduction strategy it referred to as an "economic liability transaction." In accordance with this strategy, KPMG advised OWF that OWF's underwater leases could be used to reduce its federal income tax liability. The contingent-liability strategy called for accelerating future tax deductions to create current losses that could be used to shield current income from tax.

The strategy involved three steps. First, OWF would create a new subsidiary or locate an existing subsidiary holding corporation for use. Second, OWF would make a tax-free transfer of valuable assets and tax-deductible liabilities to the subsidiary. Combining features of sections of the Internal Revenue Code ("the Code") make this tax-free transfer theoretically possible. In general, a transfer of property into a corporation in return for stock in that corporation results in a taxable gain or loss, depending on the difference between the tax basis[2] in the transferred property and the tax basis of the stock. But 26 U.S.C. § 351(a) provides that a taxpayer will recognize no gain or loss from its transfer of property into a corporation solely in exchange for that corporation's stock, provided that it controls the corporation immediately thereafter. Furthermore, 26 U.S.C. § 358(a)(1) provides that, as a general rule, a taxpayer's tax basis in the stock it receives through a § 351 tax-free transfer must be equal to the tax basis of the property transferred into the corporation. If, in addition to stock, a taxpayer receives money, it must reduce its tax basis in the stock by the same amount. 26 U.S.C. § 358(a)(1)(A)(ii). Generally, if, pursuant to a § 351 transfer, a corporation assumes some liabilities of the taxpayer, then the corporation's assumption of those liabilities is treated "as money received by the taxpayer." 26 U.S.C. § 358(d)(1). Thus, ordinarily, the corporation's assumption of the liabilities would require the taxpayer to reduce its tax basis in the stock. However, under 26

---

[2]Black's Law Dictionary defines a tax basis as "[t]he value assigned to a taxpayer's investment in property and used primarily for computing gain or loss from a transfer of the property. Basis is usu[ally] the total cost of acquiring the asset, including the purchase price plus commissions and other related expenses, less depreciation and other adjustments." Black's Law Dictionary (9th ed. 2009).

-4-

U.S.C. §§ 358(d)(2) and 357(c)(3), if the corporation assumes liabilities the payment of which would give rise to a tax deduction, then the corporation's assumption of those liabilities does not require the taxpayer to reduce its tax basis in the stock.

Accordingly, the second step of the contingent-liability strategy that KPMG proposed would require OWF to transfer valuable assets and an equal amount of tax-deductible future liabilities to the designated subsidiary holding corporation, in exchange for stock in that corporation. The stock's market value would be reduced by the negative value of the tax-deductible future liabilities, but the stock's tax basis would remain equal to the tax basis of the assets transferred to the corporation—*unreduced* by the negative value of the future tax-deductible liabilities. Finally, the third step would involve OWF selling the high-tax-basis/low-market-value stock to an outside third party at the low market value, resulting in a seemingly sizable capital loss that could be used to shield current income from tax.

KPMG advised OWF that the contingent-liability strategy required a non-tax business purpose to succeed. Thus, "[a]scertaining a non-tax business purpose[] was 'the first question' KPMG asked of clients considering the transaction." *WFC Holdings Corp. v. United States*, No. 07-3320 JRT/FLN, 2011 WL 4583817, at *4 (D. Minn. Sept. 30, 2011). Donald Dana managed OWF's Corporate Properties Group (CPG), which oversaw all properties owned or leased by every entity under OWF's control. Dana was responsible for identifying a non-tax business purpose for OWF's use of the contingent-liability strategy.

Dana identified two business purposes for transferring 21 of the Bank's leased properties to the designated subsidiary holding corporation. First, he proposed that managers of the designated subsidiary holding corporation could be incentivized to exceed market expectations by sharing in the equity of the properties. Second, the strategy would strengthen OWF's hand in negotiations with its "good bank customers"—customers who both (1) banked with OWF and (2) leased properties

-5-

from OWF. At that time, OWF's senior tax attorney Karen Bowen "sent an internal e-mail message in which she stated, 'We are working with CPG on a project to move underwater leases to a special purpose entity *to trigger unrealized tax losses.*'" *Id.* at *5 (citation omitted). OWF then merged with Norwest to become WFC.

Afterwards, WFC significantly revised the business purpose for the contingent-liability strategy. Dan Vandermark, the former Vice Present of Tax for Norwest, became the Vice President of Tax for WFC. Vandermark's position gave him discretion to veto the strategy's use as a tax-reduction strategy. Vandermark instructed Dana to create a business purpose document that would withstand IRS scrutiny. Vandermark considered the existing strategy to have a "99.9% chance of losing" a tax audit. *Id.* at *8. "Vandermark testified that . . . 'we knew we were going to be going to court on this, and so we wanted to be prepared for it from the get-go. So I told them that we would need to document—fully document every aspect of the—business purpose of this transaction.'" *Id.* (citation omitted). WFC regulatory attorney, Julius Loeser, subsequently articulated another business purpose for the contingent-liability strategy: the avoidance of OCC regulations.

> Loeser explained by email that transferring underwater leases into a non-banking subsidiary would seem to confer a tremendous regulatory benefit to WFC. Specifically, Loeser explained that pursuant to OCC regulations, WFC had a limited time period in which to dispose (i.e. through assignment or termination) of leased space that was no longer actively used in banking operations and had not been coterminously subleased. By contrast, the Fed, with regulatory oversight over the non-bank subsidiary expected to receive the underwater leases, imposed no such mandatory disposition regulations for leased premises. Transferring underwater leases into a non-banking subsidiary would therefore allow WFC more flexibility in managing the leases.

*Id.* Dana wrote a new version of the business-purpose document that incorporated the regulatory purpose. The new document stated that CPG's ability to execute lease

extensions to its subtenants was impeded by the OCC's rule that properties had to be disposed of within five years. It explained that transferring the leases to a non-banking subsidiary would cause them to fall under the Fed's less stringent regulatory regime.

> As an example, Dana cited the Garland operations building on the fringe of downtown Los Angeles. The Garland building, acquired from First Interstate in 1996, is a 700,000 square foot space rendered superfluous after the merger. The bottom floors have no windows and are essentially designed as a vault. WFC was liable to pay rent on a lease on the Garland building through 2009, with multiple purchase and lease extension options. Bank of America, WFC's competitor, was interested in leasing 130,000 square feet of the Garland building, including the cash vault, but required more than a ten-year term. According to Dana, OCC regulations prohibited him from offering such a sublease beyond the mandatory disposition period. Accordingly, Bank of America walked away from the deal.

*Id.* at *9.

WFC's final stated business purpose for its strategy included (1) avoiding OCC regulatory restrictions, (2) strengthening its negotiating position with respect to its subtenant "good bank customers," and (3) incentivizing managers. *Id.*

WFC then initiated the following transactions. In December 1999, pursuant to a lease restructuring transaction (LRT), the Bank transferred government securities with a tax basis of roughly $426 million, plus leasehold interests in 21 commercial properties (along with the associated rental liabilities), to a holding corporation that WFC controlled, Charter Holdings, Inc. ("Charter"). In return, Charter issued 4,000 shares of its stock to the Bank and assumed the lease obligations. The Bank then sold its 4,000 shares of Charter stock to WFC for $4 million, which sold it to Lehman Brothers, Inc. for $3.7 million two months later. WFC filed a tax return for 1999 that included a deduction for a capital loss of roughly $423 million. WFC did not utilize

the capital loss in its 1999 return, but in 2003, WFC filed a refund claim in which it claimed a capital loss carryback from its 1999 tax return that resulted in part from the 1999 capital loss. WFC claimed a refund of $82,313,366 for the 1996 tax year.

In 2007, the Internal Revenue Service (IRS) disallowed the refund. WFC filed suit, seeking a refund of the taxes. The district court conducted a trial on the merits and entered judgment in favor of the IRS on all claims. The district court found that, although the government failed to prove that WFC violated IRS requirements, the LRT/stock transfer nevertheless failed both the "business purpose" and "economic substance" components of the common law sham transaction test.

## II. *Discussion*

WFC argues that the IRS should have allowed its $82,313,366 refund for the 1996 tax year. It argues that the district court erred in finding that the LRT/stock transfer constitutes a sham transaction. "The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) (citing *Am. Realty Trust v. United States*, 498 F.2d 1194, 1198 (4th Cir. 1974)).

Under the Code, "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). "Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." 26 C.F.R. § 1.165–1(b).

Under the common law "sham transaction" or "economic substance" doctrine, "even if a transaction is in 'formal compliance with Code provisions,' a deduction will be disallowed if the transaction is an economic sham." *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (quoting *Am. Elec. Power Co. (AEP) v. United States*, 326 F.3d 737, 741 (6th Cir. 2003)).

Although taxpayers may structure their business transactions in a manner that produces the least amount of tax, *see Boulware v. United States*, 552 U.S. 421, 430 n.7, 128 S. Ct. 1168, 170 L. Ed. 2d 34 (2008) (citing *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S. Ct. 266, 79 L. Ed. 596 (1935)); *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781 (5th Cir. 2001), *rev'g* 113 T.C. 214, 1999 WL 735238 (1999), the economic substance doctrine requires that a court disregard a transaction that a taxpayer enters into without a valid business purpose in order to claim tax benefits not contemplated by a reasonable application of the language and the purpose of the Code or the regulations thereunder, *see, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998), *aff'g in part, rev'g in part* T.C. Memo. 1997-115; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir. 1985), *aff'g in part*, *rev'g in part* 81 T.C. 184, 1983 WL 14860 (1983); *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. 161, 2009 WL 960213 (2009), *aff'd*, 408 Fed. Appx. 908 (6th Cir. 2010); *Blum v. Commissioner*, T.C. Memo. 2012-16; *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009-288. Such a transaction is disregarded even though it may otherwise comply with the literal terms of the Code and the regulations thereunder. *See, e.g.*, *Coltec Indus., Inc.*, 454 F.3d at 1351–1355.

While the origin of the economic substance doctrine is generally traced to the Supreme Court's holding in *Gregory v. Helvering*, 293 U.S. 465, 55 S. Ct. 266, 79 L. Ed. 596, current application of the doctrine stems primarily from the Supreme Court's decision in *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S. Ct. 1291, 55 L. Ed. 2d 550 (1978). In *Frank Lyon Co.*, 435 U.S. at 566–568, the taxpayer borrowed $7.1 million from one bank, bought a building from another bank for $7.6 million, and leased the building back to the same bank which had sold the property for rent equal to the taxpayer's payments of principal and interest on the $7.1 million loan. The taxpayer claimed depreciation deductions on the building and interest deductions on the loan and reported the payments from the bank as income from rent. *Id.* at 573. The United States argued that the transaction should be disregarded because it was merely an elaborate financing scheme designed to manufacture tax deductions. *Id.* The Court disagreed, holding that the transaction was not

a sham. *Id.* at 583–584. The Court set forth the following standard for determining when a transaction should be respected for tax purposes:

> [W]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

> * * *

> [*Id.*]

*Gerdau Macsteel, Inc. v. C.I.R.*, 139 T.C. 67, 168–69 (T.C. 2012) (alterations in original) (footnotes omitted).

In determining whether a transaction is a sham for tax purposes, the Eighth Circuit has applied a two-part test set forth in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir. 1985), which the Fourth Circuit ostensibly found in the Supreme Court's opinion in *Frank Lyon Co*. See *Shriver v. Comm'r*, 899 F.2d 724, 725–26 (8th Cir. 1990). Applying that test, a transaction will be characterized as a sham if "it is not motivated by any economic purpose outside of tax considerations" (the business purpose test), and if it "is without economic substance because no real potential for profit exists" (the economic substance test). *Id.* at 725–26. The *Shriver* Court analyzed the transaction at issue in that case under both parts of the test, but then said in dictum, "[W]e do not read *Frank Lyon* to say anything that mandates a two-part analysis." *Id.* at 727. The Court suggested that a failure to demonstrate either economic substance *or* business purpose—both not required—would result in the conclusion that the transaction in question was a sham for tax purposes.

*IES Indus., Inc. v. United States*, 253 F.3d 350, 353–54 (8th Cir. 2001) (alteration in original). *IES* did "not decide whether the *Rice's Toyota World* test requires a two-part analysis because [it] conclude[d] that the [transactions in that case] had both economic substance and business purpose." *Id.* at 353–54. Hence, this court has not yet adopted a particular approach to the sham transaction test.[3] Because we hold that WFC's LRT/stock transfer has *neither* economic substance *nor* business purpose, we need not definitively resolve that issue. *See Shriver*, 899 F.2d at 726–27. "'[T]he transaction[s]

---

[3]We note that

[t]he Courts of Appeals are split on the proper weight to be given to these prongs in deciding whether to respect a transaction under the economic substance doctrine, and alternative approaches have emerged. Some Courts of Appeals apply a disjunctive analysis, under which a transaction is valid if it has economic substance or a business purpose. *See, e.g.*, *Horn v. Commissioner*, 968 F.2d 1229, 1236–1238 (D.C. Cir. 1992), *rev'g Fox v. Commissioner*, T.C. Memo. 1988-570; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 91. Other Courts of Appeals apply a conjunctive analysis, under which a transaction is valid only if the transaction has economic substance beyond tax objectives and the taxpayer had a nontax business purpose for entering into the transaction. *See Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006); *Winn-Dixie Stores, Inc. v. Commissioner*, 254 F.3d 1313, 1316 (11th Cir. 2001), *aff'g* 113 T.C. 254, 1999 WL 907566 (1999); *United Parcel Serv. of Am., Inc. v. Commissioner*, 254 F.3d 1014, 1018 (11th Cir. 2001), *rev'g* T.C. Memo. 1999-268. Still other Courts of Appeals adhere to the view that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance. *See, e.g.*, *Coltec Indus., Inc.*, 454 F.3d at 1355. And still other Courts of Appeals treat the objective and subjective prongs merely as factors to consider in determining whether a transaction has any practical [economic effects other than the creation of income tax losses.] *Commissioner*, 157 F.3d at 248.

*Gerdau Macsteel, Inc.*, 139 T.C. at 169–70.

must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.'" *IES*, 253 F.3d at 356 (alterations in original) (quoting *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945)).

### A. *Objective Economic Substance*

Under the Code, "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). "Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." 26 C.F.R. § 1.165–1(b). Several decades ago, this court discussed the circumstances under which a taxpayer could claim an exemption for a loss in the context of a similar revenue act:

> To secure a deduction, the statute requires that an actual loss be sustained. An actual loss is not sustained unless when the entire transaction is concluded the taxpayer is poorer to the extent of the loss claimed; in other words, he has that much less than before.

> A loss as to particular property is usually realized by a sale thereof for less than it cost. However, . . . the realization of loss is not genuine and substantial . . . . [where] the taxpayer has not actually changed his position and is no poorer than before the sale. The particular sale may be real, but the entire transaction prevents the loss from being actually suffered. Taxation is concerned with realities, and no loss is deductible which is not real.

*Shoenberg v. Comm'r of Internal Revenue*, 77 F.2d 446, 449 (8th Cir. 1935). More recently, this court stated:

> "A transaction will not be given effect according to its form if that form does not coincide with the economic reality and is, in effect, a sham." *F.P.P. Enterprises v. United States*, 830 F.2d 114, 117 (8th Cir. 1987). "'The presence or absence of economic substance is determined by viewing the objective realities of the transaction, namely, whether

what was actually done is what the parties to the transaction purported to do.'" *Massengill* [*v. C.I.R.*], 876 F.2d [616,] 619 [(8th Cir. 1989)] (quoting *Killingsworth v. Commissioner*, 864 F.2d 1214, 1216 (5th Cir. 1989)).

*Gran v. Internal Revenue Serv. (In re Gran)*, 964 F.2d 822, 825 (8th Cir. 1992). "[A] transaction will be characterized as a sham if . . . it 'is without economic substance because no real potential for profit exists' . . . ." *IES*, 253 F.3d at 353 (quoting *Shriver*, 899 F.2d at 725–26).

Here, the district court "readily conclude[d] that the stock sale from the [Bank] to WFC and from WFC to Lehman lacked economic substance and did not accomplish what WFC purports it to have done." *WFC Holdings Corp.*, 2011 WL 4583817, at *45 (citing *Shell Petroleum Inc. v. United States*, No. H-05-2016, 2008 WL 2714252, at *37–38 (S.D. Tex. July 3, 2008)). The court found that, "in entering into a transaction that it knew would include a bona fide loss of $423 million, under the economic substance test WFC should have reasonably anticipated a profit in excess of that amount." *Id.* Nevertheless, "[WFC] cannot show that the LRT had the potential to generate profits anywhere near the loss it allegedly sustained in the stock sale, or over $423 million in gain." *Id.*

WFC maintains that we need look no farther than the district court's findings to see that the LRT had economic substance. WFC points to the district court's finding "that [it] had a substantial liability on its hands in the form of post-merger superfluous property and underwater leases." *Id.* at *46. WFC argues that the district court explicitly "agree[d] with [it] that transference of underwater property to a nonbanking subsidiary can sometimes improve a bank's ability to market lease tails and take advantage of prospective lucrative subleasing opportunities that otherwise would not exist in ORE properties." *Id.* at *38. WFC argues that more than $380 million of the $423 million in leases that were transferred to Charter were properties that were either clearly ORE or at risk of ORE designation under the OCC's ambiguous regulatory

-13-

standards. It maintains that the transfer of the leases from the Bank to Charter freed them from the OCC's stringent mandatory-disposition requirements, which had precluded the collection of any loss-mitigating sublease rent after the end of the disposition period. In particular, WFC observes that the court found that its lease transfer of the 700,000-square-foot Garland building in downtown Los Angeles to Charter "enhanced WFC's ability to maximize its profits from" its "lease extension and purchase options" on that lease. *Id.* at *48. WFC points out that the court found that "Garland . . . had a large profit potential due to the prospective reduction in master lease payments," *id.* at *38, and even that "Garland subleases have subsequently generated millions of dollars in profit." *Id.* at *30. WFC also argues that the district court erred in finding that the issuance and sale of stock to Lehman had no non-tax economic effects.

The government responds that WFC has misconstrued the court's findings. According to the government:

> What the court actually found was that transferring leases to "a non-banking subsidiary can sometimes improve a bank's ability" to sublease "ORE property," citing only "Garland" as an example. But, as the court further found, [WFC] could have obtained that profit potential by "simply transferr[ing] the leases to a non-banking subsidiary without accepting the administrative burdens and transaction costs of creating a new class of stock and subsequently selling it." [WFC] . . . could have transferred the leases to Charter without engaging in the three-step LRT/Stock Transaction.

(Citations omitted) (second alteration in original.) The government argues that the creation and sale to Lehman Brothers of the Charter stock were crucial steps of the LRT/stock transaction that had no practical economic effect on WFC's ability to remove the Garland property from OCC oversight and develop its profit potential.

The government's argument is correct. WFC has misconstrued the district court's findings. WFC's transfer of the Garland lease to Charter—one economically beneficial component of a much larger, complex transaction—does not impart economic substance to the larger LRT/stock transaction. We agree with the district court, which stated:

> The Court cannot isolate one part, or even a few parts, of one step of a large, complex transaction and find that its profit potential imbues the entire transaction with substance which is otherwise lacking. . . . [B]y focusing on Garland's profitability and asking the Court to disregard the stock sale to Lehman as a mere inconsequential recognition event, . . . WFC . . . seeks to isolate a kernel of prospective profitability to justify a large, multi-step, multi-property transaction. This the Court cannot do. WFC has not shown that the LRT, viewed as a whole, had economic substance . . . .

*Id.* at *48. "Modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance." *Salina P'ship LP v. C.I.R.*, T.C. Memo. 2000-352 at *12 (T.C. 2000) (citations omitted). Viewing "the transaction . . . as a whole," the LRT/stock transaction did not create "a real potential for profit." *IES*, 253 F.3d at 353, 356 (quotations, alterations, and citation omitted). Consequently, the district court did not err in finding that the LRT/stock transaction lacked objective economic substance.

### B. *Subjective Business Purpose*

> The business purpose inquiry examines whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved. *See* [*Rice's Toyota World*, 752 F.2d at 91–92]. The determination of whether the taxpayer had a legitimate business purpose in entering into the transaction involves a subjective analysis of the taxpayer's intent. *Kirchman v. Commissioner*, 862 F.2d 1486, 1492 (11th Cir. 1989).

*Shriver*, 899 F.2d at 726.

> [W]e . . . consider factors that are arguably relevant to the inquiry. We do so, however, mindful of the fact that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S. Ct. 266, 79 L. Ed. 596 (1935). A taxpayer's subjective intent to avoid taxes thus will not by itself determine whether there was a business purpose to a transaction.

*IES*, 253 F.3d at 355 (third alteration in original).

> Viewing the LRT/stock transfer as a whole, the district court found

> that WFC has failed to establish a legitimate business purpose for the transaction other than tax benefits. As in *Haberman Farms, Inc. v. United States*, 305 F.2d 787, 792 (8th Cir. 1962), in which the Eighth Circuit rejected as a sham a transaction involving a farming business' transfer of certain liabilities into a subsidiary, "an analysis of [WFC's] asserted reasons [for the LRT] in the light of the facts leaves [the Court] with the distinct impression that in actuality the reasons are thin and tenuous and that the only substantive one among them is the tax motivation."

*WFC Holdings Corp.*, 2011 WL 4583817, at *44 (alterations in original).

WFC argues that it entered the LRT/stock transaction "with a subjective intent to treat [it] as [a] money-making transaction[]." *See IES*, 253 F.3d at 355. Given our conclusion that the LRT/stock transaction had no real potential for profit, *supra*, Part II.A., WFC faces an uphill battle to establish that it had a subjective intent to treat the LRT/stock transfer as a money-making transaction. Even so, we examine WFC's three asserted business purposes: avoidance of OCC regulations, strengthening WFC's

negotiating position with "good bank customers," and creating management efficiencies.

### 1. *Avoidance of OCC Regulations*

WFC argues that the LRT/stock transfer was motivated by its concern to free its leases on ORE property from what it characterizes as the OCC's stringent mandatory-disposition regulations in order to make its leases easier to manage. WFC argues that the district court engaged in a "slicing and dicing" approach to its business-purpose analysis, in violation of the Supreme Court's mandate that the transaction must be viewed as a whole. *See Court Holding Co.*, 324 U.S. at 334 ("[T]he transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant."). WFC argues that the district court required it to show that its regulatory rationale separately explained its transfer of leases to Charter and its transfer of stock to Lehman.

> Addressing the stock transfer, the district court found that

> regulatory concerns do not explain the issuance of the Preferred Stock and sale of the stock to Lehman. If WFC wanted to escape OCC supervision, it could have simply transferred the leases to a non-banking subsidiary without accepting the administrative burdens and transaction costs of creating a new class of stock and subsequently selling it.

*WFC Holdings Corp.*, 2011 WL 4583817, at *36. Furthermore, addressing the lease transfer, the district court found that "the record contains compelling evidence that regulatory concerns did not lead WFC to transfer the selected leases to Charter." *Id.* As the court found:

> Dana testified that although regulatory concerns drove the transaction, he *did not consult any WFC-generated list of ORE properties* when assembling the portfolio. While the business purpose document

ultimately contained a partial list of "good bank customers" in the selected leases, WFC cited no written material quantifying those properties which were ORE or at risk of such designation.

*Id.* at *37. The court noted that "there is no clear, bright-line rule promulgated by the OCC to determine when a partially vacated former bank premises constitutes ORE." *Id.* at *16. Nevertheless, based on the evidence, as many as 11 and as few as three of the 21 leases transferred to Charter were actually ORE. *See id.* at *36.

Dana identified at least ten of the twenty-one selected leases as not ORE, while an internal email from 2000 identified a mere three of the properties as having been ORE before the transfer to Charter. Louisiana Street, for example, was nearly 100% occupied by the bank. It appears, however, that WFC incongruously declined to include numerous underwater leases in the transaction. Several of the selected leases had master leases expiring before the ten-year ORE disposition period, and Wells Fargo signed coterminous subleases for periods of less than forty-eight months both before and after the LRT. (*See, e.g.*, Px. 45 at 127 (Charles Schwab sublease), Px. 121 (City of Los Angeles sublease).) These facts undermine WFC's contention that it sought to increase the marketability of lease tails through Fed oversight.

*Id.* at *36. Furthermore,

from 1996 to 1998, no one at Wells Fargo contacted the OCC to determine whether the selected leases WFC now characterizes as "at risk" of ORE designation were in fact at risk, or whether the bank could exercise certain lease extension options pursuant to 12 C.F.R. § 34.83(a)(3)(i), as amended in 1996.

*Id.* at *37. Consequently, the court found that WFC "failed . . . to show that the regulatory concern drove the transfer to a non-banking subsidiary of the[] . . . selected

leases, and it has entirely failed to establish that this purpose motivated the LRT as a whole." *Id.* at \*36.

We do not find that the district court's business-purpose analysis amounted to an improper "slicing and dicing" approach. To be sure, the district court found that the regulatory rationale was not the business purpose for either the stock transfer or the lease transfer. It did so because the regulatory rationale was not the business purpose for the LRT/stock transfer as a whole. Dana selected the 21 properties before WFC produced the regulatory rationale. Also, most of the properties are not actually ORE. These facts undermine WFC's claim that it engaged in the LRT/stock transfer to avoid the OCC's disposition provisions for ORE property. We hold that the district court did not err in finding that WFC failed to meet its burden of proving by a preponderance of the evidence that avoiding OCC regulations was its business purpose for the LRT/stock transfer.

## 2. *Other Alleged Business Purposes*

WFC argues that two other purposes motivated the LRT/stock transfer. First, it argues that it was motivated to strengthen its negotiating position with respect to its "good bank customers." Second, it argues that it was motivated to enter the LRT/stock transfer to create management efficiencies. The district court's factual findings reflect that WFC failed to show that either of these business purposes motivated its transactions as well. In particular, addressing WFC's "good bank customer" rationale, the district court found that

> the first written notice to [WFC's] lease negotiators on the effect of the transfer was on June 30, 1999, approximately six months after the LRT and after numerous subleases and other documents had already been signed. Notably, the memorandum did not discuss how lease negotiators could or should use a fiduciary duty to Charter's outside investor to deflect attempts by good bank customers to obtain favorable terms on deals. Pursuant to the memorandum, subtenants—presumably including

-19-

numerous good bank customers—were not informed of the transfer to Charter and continued making sublease payments directly to the bank.

*Id.* at *39. "Even after the issuance of the memorandum, CPG employees, including vice presidents, continued to sign subleases and other documents *with entities considered good bank customers* in the name of the bank despite the transferring banks having signed away their interest to Charter." *Id.* at 40. We agree with the district court that

> [WFC's] laxness in enforcing the form of the LRT, and in particular ensuring that the lease negotiators knew how to leverage the fiduciary duty owed to outside investors, severely undermines WFC's assertion that it executed the LRT for the purpose of using Charter's name and duty to its outside investor to fend off pressure from good bank customers.

*Id.* Likewise, our review confirms the district court's finding that

> the record is bereft of evidence showing how the LRT enabled any financial benefit from the avoidance of bureaucracy and centralization or how WFC legitimately hoped it would do so. To the contrary, WFC did not act in a manner consistent with the stated business purpose of centralization and bureaucratic avoidance.

*Id.* at *43.

Consequently, we hold that the district court did not err in finding that WFC failed to prove by a preponderance of the evidence that the LRT/stock transfer was motivated by a purpose to strengthen its hand with good bank customers or to create management efficiencies.

### III. *Conclusion*

Because we hold that the district court did not err in finding that the LRT/stock transfer lacked both objective economic substance and a subjective business purpose, we affirm the judgment of the district court.

_____