# United States Tax Court

T.C. Memo. 2023-50

NORTH DONALD LA PROPERTY, LLC, NORTH DONALD LA
INVESTORS, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 24703-21.                                    Filed April 18, 2023.

————————

*John R. Davidson*, *Ronald A. Levitt*, *Gregory P. Rhodes*, *Michelle A. Levin*, *Sarah E. Green*, *Sidney W. Jackson IV*, and *Logan C. Abernathy*, for petitioner.

*Richard L. Wooldridge*, *Richard J. Hassebrock*, *Scott Lyons*, *Peter N. Tran*, *Gary R. Shuler*, *Allison N. Kruschke*, *Lynn M. Barrett*, and *Alexandra E. Nicholaides*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*: This case involves a charitable contribution deduction claimed by North Donald LA Property, LLC (NDLA or partnership), for the donation of a conservation easement. The Internal Revenue Service (IRS or respondent) issued the partnership a notice of final partnership administrative adjustment (FPAA) for 2017 disallowing this and other deductions and determining fraud and accuracy-related penalties. Petitioner timely petitioned this Court for readjustment of partnership items.

Currently before the Court are respondent's Motions for Partial Summary Judgment. Respondent contends that the IRS properly disallowed the charitable contribution deduction because the former owners

[*2] of the land over which the easement was granted allegedly reserved to themselves the right to mine subsurface clay. According to respondent, this means that the conservation purpose is not "protected in perpetuity." *See* § 170(h)(5)(A).[1] Separately, respondent contends that the IRS complied with the requirements of section 6751(b)(1) by securing timely supervisory approval of all penalties at issue. We will deny the Motion addressed to section 170(h)(5)(A) and grant the Motion addressed to section 6751(b)(1).

## *Background*

The following facts are derived from the pleadings, the parties' Motion papers, and the Exhibits and Declarations attached thereto. The facts are stated solely for purposes of deciding respondent's Motions and are not findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

A.   *Conservation Easement*

NDLA is a Missouri limited liability company. It is treated as a TEFRA partnership for Federal income tax purposes, and petitioner, North Donald LA Investors, LLC, is its tax matters partner.[2] The partnership had its principal place of business in Missouri when the Petition was timely filed.

In March 2016 David Brooks Donald and his family members (Donald family) executed a Limited Warranty Deed in favor of the Reserve at Welsh, LLC (Welsh), a Missouri entity. Welsh thereby acquired a 3,324-acre tract in Jefferson Davis Parish, Louisiana, in exchange for $9,888,008. This translates to a price per acre of $2,975.

Welsh acknowledged that it was acquiring the tract "subject to any prior mineral reservations or mineral deeds of record . . . which [the Donald family's] predecessors in title may have created and caused to be duly and properly recorded." In the Limited Warranty Deed the Donald

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2] Before its repeal, TEFRA (Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71) governed the tax treatment and audit procedures for many partnerships, including NDLA.

[*3] family explicitly "reserve[d] 75% of all oil, gas, or other minerals of any kind or character whatsoever." But they "specifically exclude[d] surface minerals from this reservation."

On October 6, 2017, Welsh conveyed to NDLA, as a capital contribution, a fee simple interest in a 260.48-acre tract that was carved from the 3,324-acre tract described above. Welsh reserved no rights in the 260.48-acre tract. The conveyance document, captioned "Contribution of Capital," specifies no consideration for the transfer.

On October 12, 2017, NDLA obtained an opinion letter from Louisiana attorney Kevin D. Millican addressing NDLA's rights to clay deposits associated with the 260.48-acre tract. Mr. Millican stated that, under Louisiana law, "[o]wnership of land includes all minerals naturally occurring in a solid state," so that "[s]olid minerals are insusceptible of ownership apart from the land until reduced to possession." The letter concluded that clay is a mineral "naturally occurring in a solid state," and hence that "the owner of the surface rights would be entitled to . . . 100% of the production of any clay." Because NDLA owned the surface rights, and because the Donald family had "specifically exclude[d] surface minerals from [their] reservation" of mineral rights, Mr. Millican concluded that NDLA had acquired, by contribution to capital from Welsh, any and all rights to mine clay on the 260.48-acre tract.

On November 1, 2017, the Donald family executed, in exchange for $29,304, a Quit Claim and Amendment to Limited Warranty Deed (Quitclaim Deed) in favor of Welsh and NDLA. The Quitclaim Deed addressed two points. First, the Donald family sold and relinquished to NDLA any rights the Donald family "ha[d] or may have in any of the surface minerals located on the 260.48-acre tract of land owned by [NDLA]." The Quitclaim Deed defined "surface minerals" to include "soil, coal, sand, rock, gravel, clay, and any other surface minerals."

Besides relinquishing any rights to surface minerals, the Quitclaim Deed amended the Limited Warranty Deed by restricting the Donald family's exploitation of their reserved rights to subsurface minerals, such as oil and gas. The Quitclaim Deed provides that, "under no circumstances shall any portion of the surface of the [260.48-acre tract] be used for the exploration, development or production of said minerals." Rather, "the subsurface minerals may be withdrawn or produced from the [tract] only by means of unitization through unit wells located on other lands or by directional drilling beneath the surface of the [tract] by means of wells located on other lands."

[*4]  In December 2017 NDLA granted to the Atlantic Coast Conservancy, Inc. (ACC), a "qualified organization" under section 170(h)(3), a conservation servitude (easement) over a 245-acre parcel (Property) carved from the 260.48-acre tract discussed above.  A deed of servitude evidencing the transfer (Easement Deed) was recorded on December 29, 2017.  The Easement Deed states that its interpretation is governed by Louisiana law.

The Easement Deed grants ACC "a perpetual and irrevocable conservation servitude . . . upon, over and across the Property."  One stated purpose of the easement is to "perpetually protect[] the Property from any and all mining activities."  Specifically, the Easement Deed states as a "priority objective" to "forever sterilize the subsurface clay reserves to ensure that clay mining/extraction activities that are harmful to the existing biota never occur."

Consistent with these objectives, paragraph 5.7 of the Easement Deed bars "the exploration for . . . or extraction of minerals, oil, gas, or other hydrocarbons, soils, sands, clays, gravel, rock, or other materials on or below the surface of the Property."  Paragraph 5.7 further bars NDLA and its successors and assigns from "conduct[ing] any activity that could conflict with or cause the violation of Treasury Regulation Section 1.170A-14(g)(4)(i)."  This regulation provides that "no deduction shall be allowed [for donation of a conservation easement] when there is a retention by any person of a qualified mineral interest . . . if at any time there may be extractions or removal of minerals by any surface mining method."

Under Paragraph 6 of the Easement Deed, NDLA retained rights "to engage in all uses of the Property that are not expressly prohibited . . . and are not inconsistent with the Purpose of this Servitude."  These rights include rights to engage in forestry and recreational activities such as camping, hunting, and fishing.  They also include rights to build fences, bridges, and trails in connection with recreation and education.

B.    *Penalty Approval*

NDLA timely filed Form 1065, U.S. Return of Partnership Income, for its 2017 tax year.  On that return it claimed a charitable contribution deduction of $115,391,000 for its donation of the easement.  This valuation presupposed that the 245 acres on which the easement had been placed, acquired in March 2016 for $2,975 an acre, were worth at yearend 2017 about $471,000 per acre.  In support of this purported

**[\*5]** value the partnership relied on an appraisal prepared by Claud Clark III. His appraisal describes the "highest and best use" of the Property before the easement as "mining production use, specifically clay reserves." NDLA on this return also claimed $1,157,469 of "other deductions."

The IRS selected the partnership's 2017 return for examination and assigned the case to Senior Revenue Agent (RA) Pamela V. Stafford, a member of Team 1021 in the Large Business & International Division. At that time Supervisory RA Benjamin M. Brantley served as the team manager of Team 1021. He was thus RA Stafford's immediate supervisor.

RA Stafford determined that the partnership had significantly overvalued the easement and proposed to disallow in full both the charitable contribution deduction and the other deductions claimed on its return. In connection with the charitable contribution deduction RA Stafford recommended assertion of the 40% penalty for a gross valuation misstatement, *see* § 6662(h), and (in the alternative) assertion of a 20% penalty for a substantial valuation misstatement, a reportable transactions understatement, negligence, and/or a substantial understatement of income tax, *see* §§ 6662(a), (b)(1)–(3), (c)–(e), 6662A(b). In connection with the other deductions RA Stafford recommended assertion of a 20% accuracy-related penalty for negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2), (c), and (d).

RA Stafford's recommendations to this effect were set forth in three documents: Form 5701, Notice of Proposed Adjustment (NOPA); Form 886–A, Explanation of Items; and a penalty lead sheet. Copies of all three documents are included in the record. Mr. Brantley, her team manager, digitally signed the penalty lead sheet on April 28, 2021. He verified that he was the "immediate supervisor . . . of Pamela V. Stafford, who made the initial determination to assert the penalties indicated on this form," and that he "approve[d] that initial determination." RA Stafford has submitted a Declaration under penalty of perjury averring that these facts are true and accurate.

Anita A. Gill, senior counsel with the Office of Chief Counsel, was assigned to provide legal advice to RA Stafford during the examination of the partnership's return. After reviewing the proposed examination report and before the issuance of any NOPA, Ms. Gill concluded that the 75% civil fraud penalty should also be asserted. *See* § 6663(a).

**[\*6]**   Ms. Gill's recommendation to this effect was set forth in a penalty recommendation memorandum.  Associate Area Counsel Mark Miller hand-signed and hand-dated this memorandum on August 2, 2021, stating that he was thus supplying "managerial approval of [the fraud] penalty."  Mr. Miller confirmed that Ms. Gill "made the initial determination that the Fraud penalty . . . should apply in this case," that he was "the immediate supervisor of Anita Gill," and that he "personally approve[d] the initial determination of the penalty set forth above in compliance with section 6751(b)(1)."

That same day Ms. Gill sent an email to RA Stafford, copying Mr. Miller and stating as follows: "Senior Counsel Anita Gill has determined that fraud should be asserted in North Donald LA Property . . . Attached are a copy of . . . the fraud language and the penalty approval form, signed by her manager."  The email requested that, if RA Stafford accepted the fraud penalty recommendation and if her supervisor "approve[d] the acceptance of the recommendation," they should "prepare a short memorandum to that effect."  Ms. Gill and Mr. Miller have submitted Declarations under penalty of perjury averring that all of these facts are true.

On August 3, 2021, RA Stafford and Mr. Brantley executed a document captioned "Memorandum."  In this document RA Stafford and Mr. Brantley memorialize their acceptance of Ms. Gill's recommendation that a civil fraud penalty be asserted against NDLA.  RA Stafford and Mr. Brantley affixed at the bottom of this document their digital signatures, both dated August 3, 2021.

Six days later, on August 9, 2021, the IRS issued the partnership two NOPAs, one including the determination to impose penalties under sections 6662 and 6662A, the other reflecting the determination to impose the civil fraud penalty under section 6663.  Each NOPA has attached to it a corresponding Form 886–A supplying the rationale for imposing the penalties.  Respondent contends (and petitioner does not dispute) that each NOPA embodied the first formal communication to petitioner of the IRS's decision to assert the penalties described therein.  On August 26, 2021, the IRS issued the FPAA, which determined the same penalties.

Petitioner timely petitioned this Court for readjustment of partnership items.  On March 25, 2022, respondent filed a Motion for Partial Summary Judgment, seeking a ruling that the conservation purpose underlying the easement is not "protected in perpetuity."  On June 28,

[*7] 2022, respondent filed a second Motion for Partial Summary Judgment, seeking a ruling that he has sufficiently complied with the section 6751(b) requirements for supervisory approval of all penalties at issue. Petitioner opposed both Motions, and further briefing ensued.

*Discussion*

I.  *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We may grant partial summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. *See* Rule 121(a)(2); *Sundstrand Corp.*, 98 T.C. at 520. In deciding whether to grant partial summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party (here, petitioner). *Sundstrand Corp.*, 98 T.C. at 520. Where the moving party properly makes and supports a motion for summary judgment, "the nonmovant may not rest on the allegations or denials in that party's pleading" but must set forth specific facts, by affidavit or otherwise, showing that there is a genuine dispute for trial. Rule 121(d).

II.  *Analysis*

A.  *"Protected in Perpetuity"*

The Code generally restricts a taxpayer's charitable contribution deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property." § 170(f)(3)(A). There is an exception for a "qualified conservation contribution." § 170(f)(3)(B)(iii), (h)(1). For an easement donation to be a qualified conservation contribution, the conservation purpose must be "protected in perpetuity." § 170(h)(1)(C), (5)(A); *see PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d 193, 201 (5th Cir. 2018); *RP Golf v. Commissioner*, 860 F.3d 1096, 1099 (8th Cir. 2017).

Section 170(h)(5)(B)(i) provides that the conservation purpose will not be treated as protected in perpetuity if "there is a retention of a qualified mineral interest . . . [and] if at any time there may be extraction or removal of minerals by any surface mining method." Section 170(h)(6) provides that "the term 'qualified mineral interest' means . . . subsurface oil, gas, or other minerals, and . . . the right to access to such minerals."

[*8] Respondent contends that the conservation purpose underlying the easement is not protected "in perpetuity" because the Donald family retained "the right to mine subsurface clay" in alleged violation of section 170(h)(5) and (6).

Paragraph 5.7 of the Easement Deed explicitly bars the exploration for or extraction of minerals, defined to include "clays," "on or below the surface of the Property."  By cross-reference to Treasury Regulation § 1.170A-14(g)(4)(i), paragraph 5.7 further bars NDLA and its successors and assigns from conducting any activity that would involve "extractions or removal of minerals by any surface mining method."  The Easement Deed thus explicitly bars the partnership from engaging in surface or subsurface mining for any minerals, including clay.

In urging violation of the "perpetuity" requirement, respondent necessarily focuses, not on any mineral rights reserved by the partnership, but on rights allegedly reserved by the Donald family in the Limited Warranty Deed, which conveyed the 3,324-acre tract from which the Property was ultimately carved.  Respondent concedes (as he must) that the Donald family reserved no surface mining rights of any kind.  But the Donald family did reserve subsurface rights with respect to "75% of all oil, gas, or other minerals of any kind or character whatsoever."  Respondent asserts that this reservation included the right to mine subsurface clay.

When determining a party's rights to property for Federal tax purposes, the Tax Court applies relevant state law.  *United States v. Nat'l Bank of Com.*, 472 U.S. 713, 722 (1985); *Woods v. Commissioner*, 137 T.C. 159, 162 (2011).  The Louisiana Supreme Court has ruled that the phrase "all mineral rights" in the context of a mineral reservation "is inherently ambiguous."  *Cont'l Grp., Inc. v. Allison*, 404 So. 2d 428, 435 (La. 1981).  Thus, extrinsic evidence may be examined to determine the parties' intent when making such a mineral reservation.  *Ibid.*

The term "other minerals" is not defined in the Limited Warranty Deed, and it is not self-evident that this term includes clay.  Under Louisiana law, extrinsic evidence may thus be relevant in determining the scope of this term.  Petitioner has submitted the sworn affidavit of Dan Lavelle Donald, Jr., one of the grantor signatories to the Limited Warranty Deed.  He avers that the Donald family thereby intended to transfer all rights to access and exploit clay, reserving rights only to "75% of sub-surface liquid and gaseous minerals."  Given this affidavit, we conclude that there is a genuine dispute of material fact as to

[*9] whether the Donald family reserved any rights to exploit subsurface clay.

Assuming arguendo that the Donald family initially reserved some right to exploit subsurface clay, petitioner plausibly argues that they relinquished this right by executing the Quitclaim Deed. This document was executed two weeks after NDLA secured a legal opinion that, under Louisiana law, "the owner of the surface rights [viz., NDLA] would be entitled to . . . 100% of the production of any clay." The Quitclaim Deed defined "surface minerals" to include clay, and it relinquished to NDLA any rights the Donald family "ha[d] or may have in any of the surface minerals located on" NDLA's tract. This language is hostile to the notion that the Donald family intended to reserve any right to mine clay.

The balance of the Quitclaim Deed is equally hostile to that notion. It provides that, "[u]nder no circumstances shall any portion of the surface of the [260.48-acre tract] be used for the exploration, development or production" of minerals. Rather, any subsurface minerals to which the Donald family reserved rights "may be withdrawn or extracted . . . only by means of unitization through unit wells located on other lands or by directional drilling beneath the surface of the [tract] by means of wells located on other lands."

The term "unitization" typically refers to oil and gas resources. *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410 (10th Cir. 1990) ("Unitization refers to the consolidation of mineral or leasehold interests in oil or gas . . . ."); *see Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955 (La. 1986); *see also* 1 Bruce M. Kramer & Patrick H. Martin, *The Law of Pooling and Unitization* § 1.02 (3d ed. 2022). Oil and gas resources, moreover, would appear to be the minerals most commonly exploited by "unit wells located on other lands" or "by directional drilling beneath the surface of the [tract] by means of wells located on other lands." Respondent offers no plausible explanation as to how this language could easily embrace the mining of subsurface clay. It thus appears likely, as stated in the Declaration referenced above, that the Donald family intended to reserve rights only to "sub-surface liquid and gaseous minerals."

For all these reasons, we conclude that the "protected in perpetuity" question involves—at the very least—genuine disputes of material

**[\*10]** fact.  We will therefore deny respondent's Motion for Partial Summary judgment on this point.[3]

### B.  *Penalty Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."[4]  In TEFRA cases such as this, supervisory approval is timely if it occurs before issuance of the FPAA. *See Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 83 (2019).  If supervisory approval was obtained by that date, the partnership must establish that the approval was untimely, i.e., "that there was a formal communication of the penalty before the proffered approval" was secured. *See Frost v. Commissioner*, 154 T.C. 23, 35 (2020).[5]

Petitioner does not dispute that RA Stafford received from Mr. Brantley, her immediate supervisor, timely written approval for all penalties determined under sections 6662 and 6662A.  Accordingly,  no

---

[3] Respondent appears also to contend that the Quitclaim Deed may have reconveyed *to Welsh* the right to mine subsurface clay.  It seems obvious that Welsh is mentioned in this document only because it preceded NDLA in the chain of title:  Welsh had already conveyed the entirety of the 260.48-acre tract to NDLA, reserving no rights whatsoever.  In a similar vein respondent contends that Mr. Clark's appraisal was not a "qualified appraisal," *see* § 170(f)(11), because he ignored Welsh's supposed rights to mine subsurface clay.  Because we find that the Quitclaim Deed conveyed no such rights to Welsh, we reject this argument as well.

[4] Although the Commissioner does not bear a burden of production with respect to penalties in a partnership-level proceeding, a partnership may raise section 6751(b) as an affirmative defense.  *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 236–37 (2018).

[5] Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Eighth Circuit.  *See* § 7482(b)(1)(E).  That court has not squarely addressed the question of *when* supervisory approval must be secured.  *But cf. Wells Fargo & Co. v. United States*, 957 F.3d 840, 854 (8th Cir. 2020) ("By its terms, [section 6751(b)(1)] requires prior written approval to be obtained when the government 'assesses' a penalty against a taxpayer.").  The U.S. Court of Appeals for the Eleventh Circuit has interpreted the term "assessment" to refer to the "ministerial" process by which the IRS formally records the tax debt.  *See Kroner v. Commissioner*, 48 F.4th 1272, 1278 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73.  The supervisory approvals in this case were secured long before "assessment" and were timely under this Court's standard, which requires that approval be secured before the first "formal communication of the penalty" to the taxpayer. *Frost*, 154 T.C. at 35.

[*11] further analysis is required in order to grant respondent's Motion with respect to these accuracy-related penalties.

Petitioner advances a section 6751(b)(1) challenge only with respect to the fraud penalty. The record establishes that Ms. Gill recommended assertion of the fraud penalty and secured timely approval for this penalty from her immediate supervisor, Mr. Miller. Ms. Gill then forwarded her recommendation (thus approved) to RA Stafford and Mr. Brantley. They likewise approved inclusion of the fraud penalty. All of these approvals occurred before the NOPAs and FPAA were issued. The IRS would thus seem to have complied with section 6751(b)(1) in all respects.

Notwithstanding this record, petitioner contends that the IRS did not meet its burden under section 6751(b)(1). Petitioner first asserts that Mr. Miller approved assertion of the fraud penalty, not on August 2, 2021, as he averred, but rather on *September 2,* 2021, three weeks after issuance of the NOPA. Petitioner points to what it views as an irregularity in the handwritten "8" that forms the month of the date that accompanies Mr. Miller's signature. Petitioner's allegation is that Mr. Miller backdated his signature—by changing the number "9" to a number "8"—*after* the NOPA was issued, in order to create the impression that he had timely approved Ms. Gill's recommendation. It is on this basis that petitioner concludes that the relevant supervisory approval was untimely.

Mr. Miller has averred in a supplemental Declaration that he "originally wrote in the number nine for the month" on the penalty recommendation memorandum. "After realizing that it was August, not September, [he] immediately corrected it and wrote the number eight over the nine." He averred that he "corrected this number on that same date, i.e., August 2, 2021."

The email that Ms. Gill sent to RA Stafford, recommending assertion of the fraud penalty, corroborates Mr. Miller's attestation. That email, on which Mr. Miller was copied, stated as follows: "Senior Counsel Anita Gill has determined that fraud should be asserted in North Donald LA Property. . . . Attached are a copy of . . . the fraud language and the penalty approval form, *signed by her manager.*" That email is dated August 2, 2021, the date on which Mr. Miller avers that he signed the penalty recommendation memorandum.

**[\*12]**  Petitioner alternatively contends that Ms. Gill did not make the "initial determination" to assert the fraud penalty because, as an attorney in the Office of Chief Counsel, she supposedly "did not have authority under the Code, or as delegated by the IRS, to make the fraud penalty determination."  Petitioner asserts that "it is Chief Counsel's duty to be legal advisor to the Commissioner, not to determine penalties at the exam level." According to petitioner, "no court has found it acceptable for IRS Counsel to make the initial determination of fraud at the examination level."

We reject each of these assertions.  We have previously held that an "initial determination" of a penalty can be made by a Chief Counsel attorney, and we have dismissed petitioner's suggestion that an "initial determination" cannot take the form of a recommendation or advice. *See Graev v. Commissioner*, 149 T.C. 485, 494–98 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).  Although *Graev* involved an accuracy-related penalty under section 6662, not a fraud penalty under section 6663, neither the plain text of section 6751(b)(1) nor judicial precedent supports the view that a Chief Counsel attorney's authority to make the "initial determination" varies depending on the nature of the penalty.

As the attorney assigned to review the draft NOPAs and FPAA, Ms. Gill had the responsibility to determine whether those documents were accurate.  The *Chief Counsel Directives Manual* (CCDM) and the *Internal Revenue Manual* (IRM) establish that it is within the duties and authority of Chief Counsel attorneys to advise revenue agents and review their work. *See* CCDM 33.1.2.7.4 (June 2, 2014) (dealing with Chief Counsel's authority in reviewing notices of deficiency); *see also id.* 33.1.2.8(1) (Oct. 17, 2016) ("The role of the Field Counsel is to advise whether a deficiency notice should be issued, and if so, to make recommendations concerning the issues to be asserted . . . ."); IRM 4.31.2.7.2.5(1)(d) (May 10, 2019) ("Area Counsel must approve all FPAAs before issuance.").  Ms. Gill was the first IRS officer to recommend the fraud penalty, so her determination on this point was the "initial determination."

In any event, granting for the sake of argument petitioner's premise that an "examiner" had to make the initial determination to assert the fraud penalty, RA Stafford, the examiner, did so.  This is established by the "Memorandum," electronically signed by RA Stafford and Mr. Brantley on August 3, 2021, in which RA Stafford adopted Ms. Gill's recommendation to impose the fraud penalty, stating that "I accept the

**[\*13]** above recommendation." RA Stafford's immediate supervisor, Mr. Brantley, then approved her action, stating that "I approve the above recommendation."

Supervisory approval need not be recorded on any particular form or document. The only requirement is a writing that manifests the supervisor's intent to approve the penalty in question. *See Tribune Media Co. v. Commissioner*, T.C. Memo. 2020-2, 119 T.C.M. (CCH) 1006, 1010–11. Regardless of whether the "initial determination" of the fraud penalty is thought to have been made by Ms. Gill or RA Stafford, the penalty received the requisite approval from the appropriate supervisor(s). *See Nassau River Stone, LLC v. Commissioner*, T.C. Memo. 2023-36, at \*7–8 (rejecting arguments resembling those advanced by petitioner here and holding that the IRS secured timely supervisory approval(s) for a fraud penalty).

Finally, petitioner contends that RA Stafford's earlier decision not to assert the fraud penalty—as shown by her checking the "NO" box in April 2016 opposite "Civil Fraud" on the penalty lead sheet—precluded Ms. Gill (or any IRS officer) from later determining that such a penalty was appropriate. Petitioner misapprehends what section 6751(b)(1) requires. As we have held, the IRS need not determine all possible penalties at the same time. *See Palmolive Bldg. Invs.*, 152 T.C. at 85; *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2021-125.

The IRS often asserts penalties for the first time in its answer or amended answer. We have repeatedly held that we have jurisdiction to redetermine such penalties pursuant to section 6214(a). *See, e.g., Graev*, 147 T.C. at 476 & n.9; *Roth v. Commissioner*, T.C. Memo. 2017-248, 114 T.C.M. (CCH) 649, 652, *aff'd*, 922 F.3d 1126 (10th Cir. 2019). Whenever this occurs, it will invariably be true that the exam team did not assert the penalty in question. We have never held that the exam team's decision not to assert a penalty has any bearing on Chief Counsel's ability to assert that penalty later. To the contrary, we have held that section 6751(b)(1) is satisfied so long as the penalty asserted in the answer receives proper supervisory approval at that time. *Roth*, 114 T.C.M. (CCH) at 652. The same reasoning applies here.

To defeat a motion for summary judgment, the opposing party may not rely on mere "allegations or denials" but must "set[] forth specific facts," including facts established by affidavits or declarations. Rule 121(d) and (e). Petitioner has set forth no specific facts to dispute the existence or timeliness of the written supervisory approvals in this

**[*14]** case.  We hold that respondent has satisfied the requirements of section 6751(b)(1) and is entitled to summary judgment on this issue.

To reflect the foregoing,

*An order will be issued denying respondent's Motion for Partial Summary Judgment at docket entry #10 and granting respondent's Motion for Partial Summary Judgment at docket entry #15.*